RACHEL P.,

    Plaintiff,

v.

ANDREW M. SAUL, Commissioner of Social Security,

    Defendant.

No. 18 CV 6426

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Rachel P. worked as a security guard at O'Hare airport until an accident at work resulted in neck, back, and other injuries. When surgeries, physical therapy, and other treatments failed to alleviate her pain and other symptoms, Rachel applied for disability benefits. The ALJ who reviewed her application concluded that Rachel could perform limited light work and so was not disabled. Rachel filed this action for review of that decision.

### I.    Legal Standards

Because the Appeals Council denied review, the ALJ's decision constitutes the final decision of the Commissioner. *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). The ALJ's decision will be upheld if it applies the correct legal standards and is supported by substantial evidence. 42 U.S.C. § 405(g); *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1151 (7th Cir. 2019). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## II. Background

Rachel applied for disability insurance benefits and supplemental security income on August 10, 2015, alleging a disability onset date of July 14, 2013. A.R. 20, 189–201.[1] Her claims were twice denied before she received a hearing on June 16, 2017. A.R. 20, 41, 75–90, 93–110. The ALJ concluded that Rachel was not disabled and that she was able to perform a limited range of light work, including her previous jobs as a telemarketer or small products assembler. A.R. 31–32. The Appeals Council declined to review the ALJ's decision. A.R. 1–6.

Rachel's health problems stem largely from injuries she sustained in July 2013, when—while working as a security officer at O'Hare Airport—she tripped on an x-ray machine and fell, injuring her neck, shoulders, wrists, lower back, and knees. A.R. 392. Since her injury, Rachel has complained of neck and back pain, as well as numbness and tingling in both hands and in her left foot. *See, e.g.,* A.R. 368, 433, 437, 448. A 2013 x-ray revealed multilevel degenerative changes, spinal stenosis, and facet arthropathy. A.R. 367–68, 519–20. Arthrograms of Rachel's shoulders showed small tears and were consistent with impingement. *Id*.

In February 2014, Dr. Espinosa, a neurosurgeon, treated Rachel and noted she had paraspinal tenderness, antalgic weakness of the bilateral deltoids, and decreased

---

[1] The facts are taken from the administrative record, [9-1]. Bracketed numbers refer to entries on the district court docket.

2

sensation in fingers on both of her hands. A.R. 462–64. Dr. Espinosa reviewed a 2013 MRI of Rachel's spine and concluded it showed herniations of vertebrae, causing moderately severe central canal stenosis (an abnormal narrowing), as well as signs of myelopathy (a functional disturbance or pathological change in the spinal cord). A.R. 464; *see also stenosis* and *myelopathy*, Dorland's Online Medical Dictionary (32nd. ed. 2012), https://www.dorlands.com/dorlands/index.jsp. An orthopedic surgeon, Dr. Patari, performed a right shoulder arthroscopic surgery on May 27, 2014. A.R. 521–23. A few months later, Dr. Espinosa performed a cervical discectomy and fusion. A.R. 444–45, 464.

After her surgeries, Rachel continued to report neck and shoulder pain and stiffness, as well as burning, numbness, and tingling in her hands. A.R. 447–58, 466–68, 474–84. Dr. Patari diagnosed impingement, recommended more aggressive therapy for Rachel to regain her range of motion, and told Rachel that she should expect a normal return of function. A.R. 504. A January 2015 upper extremity EMG showed signs of peripheral neuropathy. A.R. 472. In March, Rachel tried to return to work. *See* A.R. 226. A few months later, a traveler ran over her left foot with a suitcase, and Rachel was treated for neuritis and contusion. A.R. 542, 551. By early July, she stopped working because her employer could not accommodate her restrictions. A.R. 244, 258–59; *see also* A.R. 76 (Dr. Dow noting that this period was an unsuccessful work attempt and should not affect the potential onset date). Rachel did not work in 2016 or 2017. A.R. 226.

Rachel visited Dr. Patari again in April 2016, complaining of left hand and shoulder pain and noting that she still had tingling in both hands. A.R. 500. Dr. Patari's exam indicated left scapular and shoulder strain. *Id*. He ordered an MRI and recommended physical therapy for scapular strengthening. *Id*. The MRI revealed a high-grade partial-thickness interstitial tear, and Dr. Patari recommended a left shoulder arthroscopy and rotator cuff repair. A.R. 499. In January 2017, Dr. Patari noted that Rachel continued to suffer from right shoulder and joint impingement. A.R. 497.

Dr. Espinosa completed a Work Capacity Evaluation for the Department of Labor on May 1, 2015, noting that Rachel had reached maximum medical improvement and had permanent work limitations. A.R. 431. He noted Rachel could only sit for four hours, walk for three, and stand for two; should never reach overhead; and could only reach, twist, and bend and stoop up to two hours each. *Id*. He further noted that Rachel could perform repetitive movements with her wrists for only one hour and repetitive movements with her elbows for one hour. *Id*. Finally, he noted she was limited to pushing, pulling, and lifting up to 21 pounds for 4 hours. *Id*.

Rachel testified at the hearing. When the ALJ asked her about her wrist braces, Rachel responded that she had peripheral neuropathy and that bending her hands caused a kink in the nerve and made her hands tingle and burn. A.R. 55–56. Rachel said she wore the braces at home and when she slept, but that she usually did not wear them outside of the house because they prevented her from picking anything up. A.R. 56–57. The ALJ noted that she had not seen the peripheral neuropathy

4

diagnosis in the record but that she may have missed it, and Rachel's attorney pointed her to citations in the record. A.R. 56.

Rachel testified that despite her right shoulder surgery, she could not reach behind her or above her head and that when she reached in front of her she felt pulling in her shoulder, neck, and in the middle of her back. A.R. 58. She said she suffered unpredictable episodes, where her hands would hurt and shake, and she would have to lay down until the episode passed. A.R. 58. Rachel also testified that her left foot burned and tingled, requiring her to sit down and elevate her foot four or five times a day. A.R. 59–60. Rachel stated her daughter opened any cans or bottles for her and got things out of upper cabinets so she would not have to reach overhead. A.R. 61. She also noted that while she could clean her condo, it took her much longer than it used to and that her daughter had to help move any furniture. A.R. 61. Rachel testified that she tried not to be on her feet more than a couple of hours per day to try to prevent the tingling and burning, because once it started it could last for days. A.R. 62. Sitting for extended periods caused severe back pain, which she described as feeling like somebody was stabbing her. A.R. 62–63. Rachel said she rarely used a computer, because of her hand condition, and she explained she could not work as a telemarketer, for example, because the constant reaching for the phone would be extremely painful. A.R. 64.

At the hearing, both the ALJ and Rachel's attorney questioned the vocational expert. The ALJ asked whether there was relevant work for Rachel assuming she could never climb ladders, ropes or scaffolding; could not kneel or crawl, but could

5

occasionally stoop and crouch; and could frequently reach in all directions except overhead; but could only occasionally use left foot controls. A.R. 67. The expert responded that with those restrictions an individual could work as a telemarketer or a small products assembler. A.R. 67. Next, she asked whether any of those jobs would allow Rachel to alternate sitting and standing every thirty minutes. A.R. 68. He responded that the added condition of alternating sitting and standing would eliminate all of Rachel's past work. *Id*. The ALJ then asked whether further limiting the restrictions to include occasional, rather than frequent, reaching would have any impact. A.R. 69. The expert said that would eliminate small parts assembler jobs, because they required frequent reaching. *Id*.

Rachel's attorney then asked whether an individual who could only occasionally use her hands for gross and fine manipulations could perform any of the previously discussed jobs, and the expert responded she could not. A.R. 70–71. He also noted that needing to elevate one foot 25% of the day at waist level would be considered an accommodation to the telemarketer position. A.R. 71. Finally, he said that he was unaware of any jobs that satisfied all the restrictions recommended by Dr. Espinosa. *Id*.

## III. Analysis

An ALJ uses a five-step analysis to determine whether a person is disabled under the Social Security Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Here, the ALJ found at step one that Rachel was no longer engaged in substantial gainful activity. At step two, she found that Rachel suffered from "severe impairments," and

at step three, concluded those impairments did not meet the severity of SSA's list of severe impairments. Between steps 3 and 4, the ALJ determined that Rachel had the residual functional capacity to perform light work, as defined in 20 C.F.R. 404.1567(b) and 416.967(b), with certain exceptions. A.R. 26. The ALJ concluded that Rachel could occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; occasionally stoop and crouch, but never kneel and crawl; never reach overhead, but frequently reach in all other directions; and occasionally operate foot controls with her lower left extremities. *Id*. Based on these limitations, the ALJ concluded that Rachel could perform her past work as a telemarketer or small products assembler. A.R. 33. In doing so, the ALJ adopted some of the permanent work restrictions Dr. Espinosa prescribed and disregarded others. The ALJ adopted Dr. Espinosa's recommendation about Rachel's limited ability to lift, push, and pull. She declined, however, to adopt Dr. Espinosa's opinion that in an eight-hour workday Rachel could only sit for four hours, walk for three, and stand for two. A.R. 30. The ALJ found this recommendation less persuasive, given Dr. Espinosa "primarily treated the claimant's upper back and neck issues." *Id*.

A "treating physician's medical opinion is entitled to controlling weight if it is well supported by objective medical evidence and consistent with other substantial evidence in the record." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[2] If the ALJ does not give a treating physician's opinion controlling

---

[2] The Commissioner rescinded SSR 96-2p and ordered that adjudicators no longer assign weight to medical opinions in claims filed on or after March 27, 2017. *See* SSR 96-2p, 2017

7

weight, she must "provide a sound explanation for h[er] decision to reject it and instead" rely on other evidence, such as a non-treating physician's opinion. *Roddy*, 705 F.3d at 636; 20 C.F.R. § 404.1527(c)(2). Rachel testified at the hearing that sitting for extended periods caused intense pain in the lower and middle parts of her back. A.R. 62–63. Dr. Espinosa performed surgery on Rachel's upper back, but he treated her consistently and was familiar with the range of her symptoms and her medical history, including her shoulder problems and the pain and numbness she experienced in her hands and feet. The ALJ did not explain why the non-treating physicians were somehow better suited to opine about Rachel's limitations. She said the non-treating physicians' opinions were consistent with the medical evidence, but she said the same thing about some of Dr. Espinosa's opinions. A.R. 30. She did not explain why Dr. Espinosa's opinion about Rachel's sitting, standing, and walking limitations was inconsistent with the medical records. Instead, she said he was less persuasive because his treatment focused on Rachel's upper back. But it is not obvious why Rachel's neck and upper back problems would not impede her ability to sit, stand, and walk for extended periods of time. The ALJ's cursory observation that Dr. Espinosa primarily treated Rachel's upper back and neck does not qualify as good cause to disregard his opinion on how long Rachel could sit, stand, and walk. The ALJ failed to provide a sound explanation for rejecting Dr. Espinosa's recommendation.

---

WL 3928298, at *1 (March 27, 2017). Because Rachel filed her claims in 2015, the older policy still applies.

8

Dr. Espinosa also opined that Rachel could reach in directions other than overhead for only two hours and engage in repetitive movements with her wrists and elbows for only one hour. But the ALJ did not mention this opinion (which directly related to the upper body, which Dr. Espinosa treated) when concluding that the medical evidence failed to support Rachel's claim of upper extremity limitations. Though the ALJ is not required to mention every piece of evidence, she must build a logical bridge between the evidence related to Rachel's limitations and her conclusion that Rachel could perform light work that required frequent reaching and repetitive movements. *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Without mentioning Dr. Espinosa's prescribed limitations, the ALJ failed to do so. Similarly, though the vocational expert testified that Dr. Espinosa's requirement that Rachel take three fifteen-minute breaks per workday would exceed the typical allotted breaks for all of Rachel's previously performed jobs, *see* A.R. 71, the ALJ did not address this aspect of Dr. Espinosa's opinion. An ALJ cannot disregard significant conflicting evidence when making her residual functional capacity determination. *Clifford v. Apfel*, 227 F.3d 863, 873–74 (7th Cir. 2000). On remand, the ALJ must discuss these aspects of Dr. Espinosa's opinion and adequately explain her reasoning to allow for meaningful review.

In addition to disregarding Dr. Espinosa's opinions without good cause, the ALJ referred to Rachel's "unspecified hand pain," ignoring the January 2015 EMG test showing signs of sensory peripheral neuropathy. On remand, the ALJ should address whether this test affects the outcome of her analysis. Aside from these errors,

9

Rachel argues that the ALJ failed to properly assess her lumbar spine pain and left foot neuritis. The ALJ discussed Rachel's lower back problems, left foot neuritis, and obesity, noting that tests showed Rachel had normal or only slightly diminished gait, that she was able to walk on her heels and toes, and that she had appropriate strength, reflexes, and range of motion. Rachel may have weighed this evidence differently, but on review, "[w]e do not reweigh the evidence or substitute our own judgment for that of the ALJ." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). Rachel also argues that the ALJ improperly disregarded her subjective symptoms. A reviewing court can overturn a credibility finding only if it is patently wrong, *see Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004), but on remand, the ALJ should consider whether the aspects of Dr. Espinosa's opinion discussed above tend to corroborate Rachel's subjective symptoms.

## IV. Conclusion

The Commissioner's decision is reversed, and the case is remanded for further proceedings consistent with this opinion. Enter judgment and terminate case.

ENTER:

Manish S. Shah
United States District Judge

Date: August 16, 2019

10